******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ANTONIO VITTI *v.* CITY OF MILFORD ET AL.
(SC 20350)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

The plaintiff appealed from the decision of the Compensation Review Board, which affirmed the decision of the Workers' Compensation Commissioner awarding the plaintiff benefits pursuant to statute (§ 31-308 (b)) for a 23 percent permanent partial disability on the basis of the functional capacity of his transplanted heart. While employed as a police officer for the named defendant, the city of Milford, the plaintiff was diagnosed with giant cell myocarditis and underwent a heart transplant. The plaintiff thereafter filed a claim for benefits pursuant to the statute (§ 7-433c) governing compensation for municipal police officers with hypertension or heart disease. The commissioner issued a finding and award, determining that the plaintiff had reached maximum medical improvement approximately three years after receiving the transplant and that he was entitled to benefits for a 23 percent permanent partial disability of the transplanted heart. In affirming the commissioner's finding and award, the board concluded that the commissioner had properly considered the function of the transplanted heart in awarding benefits rather than awarding the plaintiff 100 percent permanent partial disability benefits on the basis of the removal and complete loss of his native heart. On the plaintiff's appeal from the board's decision, *held* that the board properly considered the functionality of the transplanted heart after a finding of maximum medical improvement, rather than the total loss of the plaintiff's native heart, in fashioning the specific indemnity award because the plaintiff had not suffered a complete loss of that organ within the meaning of § 31-308 (b): although the language of § 31-308 (b) was ambiguous with respect to whether permanent partial disability benefits were to be based on the complete loss of a native organ or the loss of use of a transplanted organ, the legislative history surrounding § 31-308 (b) evinced an intent to balance the goals of protecting workers and compensating them for their losses with the economic burden placed on employers and insurance companies, and requiring compensation for the complete loss of a native organ, despite a successful transplant surgery that restores the organ's functional capacity, was inconsistent with and would expand the scope of benefits provided by § 31-308 (b) beyond the legislature's intent, and would require the commissioner to disregard the ameliorative effects of the transplant, contrary to this court's well established case law concerning whether a plaintiff has reached maximum medical improvement; moreover, although courts generally do not consider improvements from artificial implants in awarding permanent partial disability benefits, a transplant of live tissue is not akin to a prosthetic device for purposes of § 31-308 (b), and, accordingly, the board properly considered the functional capacity of the plaintiff's transplanted heart rather than deeming the removal of his native heart a 100 percent loss under § 31-308 (b).

Argued February 27—officially released August 24, 2020**

*Procedural History*

Appeal from the decision of the Workers' Compensation Commissioner for the Fourth District awarding certain permanent partial disability benefits to the plaintiff, brought to the Compensation Review Board, which affirmed the commissioner's decision, and the plaintiff appealed. *Affirmed.*

*Andrew J. Morrissey*, with whom, on the brief, was *David J. Morrissey*, for the appellant (plaintiff).

*Scott Wilson Williams*, for the appellees (defendants).

*Opinion*

ROBINSON, C. J. This appeal presents a question of first impression in our workers' compensation law, namely, whether a claimant who undergoes a heart transplant is entitled to a specific indemnity award for permanent partial disability under the Workers' Compensation Act (act), specifically, General Statutes § 31-308 (b),[1] for the total loss of the claimant's native heart, or whether the award should instead be based on the rated function of the claimant's new, transplanted heart. The plaintiff, Antonio Vitti, who had been employed as a police officer by the named defendant, the city of Milford (city),[2] appeals[3] from the decision of the Compensation Review Board (board) affirming the decision of the Workers' Compensation Commissioner for the Fourth District (commissioner), who awarded him permanent partial disability benefits of 23 percent based on the function of his transplanted heart. On appeal, the plaintiff claims that § 31-308 (b) mandates compensation for the 100 percent loss of his native heart because his transplanted heart is akin to a prosthetic device and, therefore, not considered in any function rating for purposes of awarding permanent partial disability benefits. We disagree and, accordingly, affirm the decision of the board.

The record reveals the following undisputed facts and procedural history. The city employed the plaintiff as a police officer from 1993 until his retirement in 2014. In August, 2010, the plaintiff began experiencing nausea, abdominal pain, and shortness of breath, which subsequently led to his diagnosis of giant cell myocarditis, a rare autoimmune disease. The plaintiff received a heart transplant on September 28, 2010. The heart transplant was successful, and the plaintiff returned to work in a part-time capacity in 2011, subsequently returning to a full-time schedule in 2012. As a result of the transplant operation, the plaintiff follows a daily medication regimen and has various activity limitations, including a reduced capacity to exercise and to travel via air to the same extent he could prior to the surgery.

In September, 2010, the plaintiff filed for workers' compensation benefits pursuant to the Heart and Hypertension Act. See General Statutes § 7-433c. In determining the specific indemnity award to which the plaintiff is entitled,[4] the commissioner issued a decision finding that the plaintiff had reached maximum medical improvement on November 21, 2013, three years after his successful heart transplant. Crediting the testimony of two medical expert witnesses and the plaintiff's description of his condition, the commissioner found that the plaintiff was entitled to an award of 23 percent permanent partial disability benefits.[5]

The plaintiff appealed from the commissioner's finding and award to the board, claiming that the commis-

sioner improperly failed to award him 100 percent permanent partial disability benefits as a result of the removal of his native heart during the transplant procedure. The board affirmed the commissioner's finding and award, concluding that the commissioner had properly considered the function of the transplanted heart in awarding permanent partial disability benefits. The board disagreed with the plaintiff's argument that a transplanted heart should be treated as akin to a prosthetic device for purposes of awarding benefits. This appeal followed. See footnote 3 of this opinion.

On appeal, the plaintiff claims that, in awarding permanent partial disability benefits, the board improperly considered the functional capacity of the transplanted heart rather than deeming the removal of his native heart a 100 percent loss under § 31-308 (b). Specifically, the plaintiff asserts that the plain meaning of the phrase "the loss of the member or organ," as used in § 31-308 (b), refers to the complete loss of the native heart when it was removed during the transplant surgery rather than the function of the subsequently transplanted heart. As a corollary, the plaintiff contends that a transplanted organ is analogous to a postamputation prosthetic device and, therefore, should not be considered for the purpose of awarding permanent partial disability benefits. The plaintiff further argues that, even if the transplanted heart is considered an organ rather than a prosthetic device, we should interpret the word "organ," as used in § 31-308 (b), as limited to *only* the native organ.

In response, the defendants contend that the board correctly interpreted § 31-308 (b) in treating the transplanted heart as an organ rather than a prosthetic device. Consistent with well established case law requiring that permanent partial disability be evaluated after the claimant reaches maximum medical improvement, the defendants further argue that the board properly considered the functioning of the transplanted heart in upholding the commissioner's award of permanent partial disability benefits. We agree with the defendants and conclude that a transplanted heart is not akin to a prosthetic device; accordingly, the plaintiff's permanent partial disability benefits properly reflect the functional loss of use of his transplanted heart rather than the total loss of his native heart.

"The principles that govern our standard of review in workers' compensation appeals are well established. The conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . [Moreover, it] is well established that [a]lthough not dispositive, we accord great weight to the construction given to the workers' compensation statutes by the commissioner and [the] board. . . .

Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . We have determined, therefore, that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . ." (Internal quotation marks omitted.) *Coughlin* v. *Stamford Fire Dept.*, 334 Conn. 857, 862–63, 224 A.3d 1161 (2020). Because the present case does not involve a time-tested interpretation, "[w]e . . . apply plenary review and established rules of construction." *Brennan* v. *Waterbury*, 331 Conn. 672, 683, 207 A.3d 1 (2019).

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and [common-law] principles governing the same general subject matter . . . .

"Furthermore, [i]t is well established that, in resolving issues of statutory construction under the act, we are mindful that the act indisputably is a remedial statute that should be construed generously to accomplish its purpose. . . . The humanitarian and remedial purposes of the act counsel against an overly narrow construction that unduly limits eligibility for workers' compensation. . . . Accordingly, [i]n construing workers' compensation law, we must resolve statutory ambiguities or lacunae in a manner that will further the remedial purpose of the act. . . . [T]he purposes of the act itself are best served by allowing the remedial legislation a reasonable sphere of operation considering those purposes." (Citation omitted; internal quotation marks omitted.) *Balloli* v. *New Haven Police Dept.*, 324 Conn. 14, 18–19, 151 A.3d 367 (2016); see, e.g., *Brennan* v. *Waterbury*, supra, 331 Conn. 683.

"At the outset, it is important to understand that the

act provides for two unique categories of benefits— those designed to compensate for loss of earning capacity and those awarded to compensate for the loss, or loss of use, of a body part. . . . Total or partial incapacity benefits fall into the first category. . . . Disability benefits, also referred to as specific indemnity awards or permanency awards, fall into the second category." (Citations omitted; internal quotation marks omitted.) *Marandino* v. *Prometheus Pharmacy*, 294 Conn. 564, 577, 986 A.2d 1023 (2010); see also *Rayhall* v. *Akim Co.*, 263 Conn 328, 349, 819 A.2d 803 (2003) (discussing act's compensation for disability via payment of medical expenses under General Statutes § 31-294d in addition to specific indemnity awards). The second category of benefits, which are provided pursuant to § 31-308 (b), the provision at issue in this appeal, enumerates a series of members and organs that, if injured, qualify an employee for disability benefits or a specific indemnity award. *Marandino* v. *Prometheus Pharmacy*, supra, 577. Prior to setting forth this comprehensive list, § 31-308 (b) provides in relevant part: "All of the following injuries include the loss of the member or organ and the complete and permanent loss of use of the member or organ referred to . . . ." This statutory text furnishes the starting point for our analysis in the present appeal.

The plaintiff argues that the plain language of § 31-308 (b), insofar as it refers to "the . . . organ," directs the commissioner to consider only the loss of the native organ.[6] As a corollary, he contends that a transplanted heart should be treated as the equivalent of a prosthetic device being used after an amputation, rendering it not an "organ" for purposes of the determining benefit awards under § 31-308 (b). In construing statutes, words and phrases are to be construed according to the "commonly approved usage of the language . . . ." General Statutes § 1-1 (a); accord *State* v. *Panek*, 328 Conn. 219, 227, 177 A.3d 1113 (2018). With no statutory definition of the term organ, we "consider the common meaning of that phrase, as expressed in the dictionary." *State* v. *Panek*, supra, 229. At the time § 31-308 (b) and its amendments were passed, "organ" was defined in relevant part as, "in animals and plants, a part composed of specialized tissues and adapted to the performance of a specific function or functions"; Webster's New World Dictionary of the American Language (2d College Ed. 1972) p. 1002; and as "a differentiated structure (as a heart . . .) consisting of cells and tissues and performing some specific function in an organism . . . ." Merriam-Webster's Collegiate Dictionary (10th Ed. 1993) p. 819; accord Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 874. It is undisputed that the transplanted heart retains the qualities that characterize an organ as the term is commonly understood. A heart transplant surgery is distinct from an amputation in that it is not a procedure concerned solely with removal;

it has the ultimate goal of replacement. Furthermore, unlike the prosthetic devices referenced by the plaintiff, a transplanted heart is—consistent with the dictionary definitions—composed of organic, living tissue and performs the same function that the native heart did, albeit at an increased functional level.

Nevertheless, in asserting that the language of § 31-308 (b) is plain and unambiguous in its limitation to the native organ, the plaintiff relies heavily on the statute's use of the definite article "the" in specifying the organ's loss or impaired function. See *Mattatuck Museum-Mattatuck Historical Society* v. *Administrator, Unemployment Compensation Act*, 238 Conn. 273, 277, 279, 679 A.2d 347 (1996) (holding that plaintiff museum was liable for unemployment benefits for art instructor, who plaintiff alleged it employed as independent contractor, because use of article "the" to modify "business" in "ABC test" statute was intended to reference "the particular activities engaged in by the plaintiff" museum specifically rather than by museums generally). This is a reasonable reading of § 31-308 (b), and, given the board's equally reasonable construction of the statute, which considered the functional capacity of the transplanted heart, the statute is ambiguous for purposes of the § 1-2z analysis. See, e.g., *Commissioner of Public Safety* v. *Freedom of Information Commission*, 312 Conn. 513, 534, 93 A.3d 1142 (2014). Accordingly, we consider extratextual sources, including legislative history, to determine whether the legislature intended the words "the . . . organ" in § 31-308 (b) to be limited to the native organ. See id.

In considering the extratextual evidence, we begin with the legislative history of § 31-308 (b). Although the legislative history of § 31-308 (b) illustrates the legislature's intent to provide benefits to employees that would compensate them for the losses of specific organs or members, it is silent on the specific issue of whether a transplanted organ is an "organ." We note, however, that, in 1967, the legislature enacted No. 842, § 15, of the 1967 Public Acts, which extended permanent partial disability benefits to include the loss of an organ or a loss of its function, in addition to the loss of body members such as limbs, but did not specifically identify which injured organs were compensable or to what degree.[7] Instead, the statute gave the commissioner the discretion to award benefits for injuries to nonscheduled organs or members. Public Acts 1967, No. 842, § 15, codified at General Statutes (Cum. Supp. 1967) § 31-308. In 1993, the legislature restructured the act in an attempt to reduce workers' compensation insurance rates paid by employers in light of an economic recession. See Public Acts 1993, No. 93-228 (P.A. 93-228); see also *Rayhall* v. *Akim Co.*, supra, 263 Conn. 346. To eliminate the perception of ambiguity that had resulted from the statute's lack of specificity as to covered body parts and its concomitant grant of discretion

to the commissioner, P.A. 93-228, § 19, specifically provided the number of weeks that an employee could be compensated under § 31-308 (b) for a total loss of certain individual body parts, including the heart.[8] See 36 S. Proc., Pt. 11, 1993 Sess., pp. 3888–89, remarks of Senator James H. Maloney ("[L]egislative intent is . . . useful [only] when there is an ambiguity. There's no ambiguity in the legislation, as drafted. There is simply a statement that the listed injuries are compensable. There is no statement that would then give any comfort to the notion that any injury that's not listed is somehow compensable . . . .").

Moreover, repeated throughout the 1993 legislative history was a desire by the legislature to set forth a balanced workers' compensation scheme. See, e.g., id., p. 3840, remarks of Senator Thomas A. Colapietro. The legislature intended for the scheme to protect workers and to compensate them for their losses but not to impose such a large burden on employers and insurance companies so as to drive jobs out of the state. Id., p. 3883, remarks of Senator John Andrew Kissel; 36 H.R. Proc., Pt. 18, 1993 Sess., p. 6298, remarks of Representative Paul R. Munns. The legislative history of the specific indemnity award, particularly after 1993, informs us that the legislature's focus was on both compensating employees for their loss of an organ and protecting Connecticut's economy by sending a clear and supportive message to employers. See *Pasquariello* v. *Stop & Shop Cos.*, 281 Conn. 656, 661, 916 A.2d 803 (2007) (stating that "the principal goal" of 1993 restructuring was to cut "employers' costs in maintaining the workers' compensation system"). Nevertheless, the legislative history is silent with respect to the treatment of transplanted organs specifically.

The plaintiff's proposed interpretation of § 31-308 (b), which would require compensation for the complete loss of the native organ despite a successful transplant that restores much of the functional capacity, is inconsistent with the legislature's adoption of a schedule of specific indemnity awards via the 1993 amendments. To stop the inquiry with the loss of a native organ, even if a new one were successfully transplanted, would automatically subject employers and insurers to compensating employees for complete losses, even when medical advances have allowed a greater degree of "maximum medical improvement" through means such as transplants.

The plaintiff asserts, however, that there is indirect evidence in the relevant statutory scheme indicating that the legislature contemplated a situation in which an employee could lose their heart, live, and be entitled to total compensation. The plaintiff points out that, pursuant to § 31-308 (b), any loss of an organ that results in death will be compensated only under General Statutes § 31-306. The plaintiff argues that that reference

to death in § 31-308 (b) demonstrates that the legislature recognized the possibility that employees may lose their hearts completely but not die. Although we are mindful that the act is remedial in nature and "should be construed generously to accomplish its purpose"; (internal quotation marks omitted) *Pizzuto* v. *Commissioner of Mental Retardation*, 283 Conn. 257, 265, 927 A.2d 811 (2007); we nevertheless find this strained construction unpersuasive. If we were to hold that the statute limited compensation only to the loss of native organs, without any consideration given to the functioning of transplanted organs, the statutory benefits would be expanded in a way that is inconsistent with the legislature's intention. It would subject employers and insurers to the payment of higher permanent partial disability awards, even in situations in which an employee receives medical care that restores a great degree of function, as was the case here.

Moreover, a holding that § 31-308 (b) is triggered automatically upon the removal of a native organ, without regard to the ameliorative effects of a transplant, would be inconsistent with nearly one century of case law governing the concept of maximum medical improvement. Indeed, we recently clarified that "permanent disability benefits vest, or become due, when the claimant reaches maximum medical improvement." *Brennan* v. *Waterbury*, supra, 331 Conn. 695; see, e.g., *Panico* v. *Sperry Engineering Co.*, 113 Conn. 707, 716, 156 A. 802 (1931) (holding that "specific indemnity for proportionate loss of use accrued" when injury "reached the stage of ultimate improvement"); *Wrenn* v. *Connecticut Brass Co.*, 96 Conn. 35, 38, 112 A. 638 (1921) ("The complete and permanent loss of the use of the arm occurs when no reasonable prognosis for complete or partial cure, and no improvement in the physical condition or appearance of the arm can be reasonably made. Until such time the specific compensation for the loss of the arm, or for the complete and permanent loss of its use, cannot be made."). The plaintiff's proposed interpretation of § 31-308 (b) as limited to the native organ would have the incongruous result of requiring the commissioner to ignore the claimant's point of maximum medical improvement when it pertains to transplants or to make a finding of maximum medical improvement prior to all potential medical interventions being exhausted, namely, before the transplant takes hold.

Finally, we address the plaintiff's argument that a transplanted heart is akin to a prosthetic device because it is not the organ with which an individual was born. Decisions of several of our sister state courts, some of which the board considered in its opinion in the present case, are instructive on this point. For example, the Florida District Court of Appeal held that there is a distinction between transplanted live tissue and a prosthetic device, which that state's Supreme Court pre-

viously had defined as an artificial substitute, in concluding that a corneal graft of living tissue was not a prosthetic device for purposes of disability benefits. See *Colonial Oaks Apartment* v. *Hood*, 680 So. 2d 446, 447–48 (Fla. App. 1996). Similarly, the Rhode Island Supreme Court specifically considered the distinction between live tissue and prosthetic devices when it concluded that a claimant who underwent a transplant surgery replacing his amputated thumb with his index finger was entitled to compensation based on post-transplant functionality. See *Fogarty* v. *State*, 103 R.I. 228, 231, 236 A.2d 247 (1967) ("Live tissue . . . is not equatable with a prosthetic device purchased from a surgical appliance dealer. One is real; the other artificial."). Along that line, other state courts have held that artificial implants do not constitute such a total replacement so as to be considered in the award of disability benefits. See *Tew* v. *Hillsdale Tool & Mfg. Co.*, 142 Mich. App. 29, 37–38, 369 N.W.2d 254 (1985) (recognizing distinction between live tissue and artificial prosthetic device in concluding that prosthetic boot should not be considered when awarding plaintiff's benefits because it does not become part of body); *Kalhorn* v. *Bellevue*, 227 Neb. 880, 886, 420 N.W.2d 713 (1988) (synthetic intraocular lens implanted into claimant's eye should be treated as prosthetic or corrective and not considered when awarding disability benefits); *State ex rel. General Electric Corp.* v. *Industrial Commission*, 103 Ohio St. 3d 420, 426–27, 816 N.E.2d 588 (2004) (intraocular plastic lens is corrective and, therefore, could not be considered in making benefits award for lost eyesight); *Creative Dimensions Group, Inc.* v. *Hill*, 16 Va. App. 439, 445–46, 430 S.E.2d 718 (1993) (artificial lens implant was corrective and prosthetic device). But see *Lee Connell Construction Co.* v. *Swann*, 254 Ga. 121, 121, 327 S.E.2d 222 (1985) (surgical improvement to claimant's eyesight via implant of permanent lens could be considered in assessing claimant's total loss of sight).

We agree with these sister state decisions; to hold that a transplanted heart is more akin to an artificial prosthetic device than to an organ composed of living tissue is inconsistent with both the common understanding of the word "organ" and the legislature's intent in amending § 31-308 (b) in 1993 to balance the benefits provided under the act.[9] Accordingly, we conclude that the board correctly determined that a functionality analysis of the transplanted heart, after a finding of maximum medical improvement, was appropriate in fashioning the plaintiff's specific indemnity award in the present case because the transplant meant that the plaintiff had not suffered a complete loss of his heart within the meaning of § 31-308 (b).

The decision of the Compensation Review Board is affirmed.

In this opinion the other justices concurred.

\* The listing of justices reflects their seniority status on this court as of the date of oral argument.

\*\* August 24, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 31-308 (b) provides in relevant part: "With respect to the following injuries, the compensation, in addition to the usual compensation for total incapacity but in lieu of all other payments for compensation, shall be seventy-five per cent of the average weekly earnings of the injured employee . . . . All of the following injuries include the loss of the member or organ and the complete and permanent loss of use of the member or organ referred to:

| "MEMBER | INJURY | WEEKS OF COMPENSATION |
|---------|--------|-----------------------|
|         | * * *  |                       |
| "Heart  |        | 520                   |
|         | * * *  |                       |

"If the injury consists of the loss of a substantial part of a member resulting in a permanent partial loss of the use of a member, or if the injury results in a permanent partial loss of function, the commissioner may, in the commissioner's discretion, in lieu of other compensation, award to the injured employee the proportion of the sum provided in this subsection for the total loss of, or the loss of the use of, the member or for incapacity or both that represents the proportion of total loss or loss of use found to exist, and any voluntary agreement submitted in which the basis of settlement is such proportionate payment may, if otherwise conformable to the provisions of this chapter, be approved by the commissioner in the commissioner's discretion. Notwithstanding the provisions of this subsection, the complete loss or loss of use of an organ which results in the death of an employee shall be compensable pursuant only to section 31-306."

[2] PMA Management Corp. of New England, Inc. (PMA), which is a third-party administrator for the city's workers' compensation benefits, is also a defendant in this appeal. Hereinafter, we refer to PMA and the city collectively as the defendants and individually by name when appropriate.

[3] The plaintiff appealed from the decision of the Compensation Review Board to the Appellate Court; see General Statutes § 31-301b; and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] The city previously contested the compensability of the plaintiff's claim on the ground that giant cell myocarditis is not "heart disease" within the meaning of § 7-433c. The Appellate Court recently upheld the board's determination that the plaintiff's condition is a compensable heart disease under § 7-433c. See *Vitti* v. *Milford*, 190 Conn. App. 398, 420, 210 A.3d 567, cert. denied, 333 Conn. 902, 214 A.3d 870 (2019).

[5] The commissioner heard testimony from three medical expert witnesses regarding the plaintiff's condition. First, Donald Rocklin, a cardiologist, testified that, prior to the heart transplant, the plaintiff's heart was failing. He also opined that the plaintiff's transplanted heart had a 23 percent impairment rating and discussed the medication regimen that the plaintiff had received. Rocklin submitted a letter to the commissioner stating that, prior to the heart transplant, the plaintiff would have received an impairment rating of 100 percent. He further analogized the plaintiff's condition to that of a coronary artery disease that is treated with medical therapy, such as a myocardial infraction. Second, Joseph Robert Anthony, a cardiologist, opined that the transplanted heart should be rated at 28 percent impairment. Third, Stephen Demeter, a board certified physician in internal medicine, pulmonary medicine and occupational medicine, testified that, prior to the heart transplant, the plaintiff had not reached maximum medical impairment. He further rated the transplanted heart at 12 percent impairment. The commissioner found the testimony of Rocklin and Demeter to be credible.

[6] The defendants argue that there was not a 100 percent loss of the native heart, citing Rocklin's testimony that 10 to 20 percent of the native heart tissue remained in the plaintiff's body after the transplant. This factual assertion, however, does not bear on the ultimate analysis of whether a transplanted heart should be considered a prosthetic. Prosthetic devices are used even when a complete loss of a member is not sustained and, therefore, do not necessitate a 100 percent loss.

[7] Speaking in support of No. 842 of the 1967 Public Acts, Representative Paul Pawlak, Sr., recognized that an employee's capacity to work may not

be directly affected by the removal of some body parts, but also that such losses might reduce that person's life expectancy. He stated: "We recognize that each organ of the body is not equally [important] to the human body and for this reason we have given the commissioners broad discretion to determine the values involved with the maximum of 780 weeks compensation. The commissioners in exercising this discretion will have to consider such factors as . . . the disabling effect of the loss of the organ with respect to the entire body and the necessity of having full use of such organ. . . . [W]e cannot establish a specific relative value for each organ of the body, but we believe that the commissioners, guided by medical assistance, will apply this provision fairly." 12 H.R. Proc., Pt. 9, 1967 Sess., p. 4040.

[8] The defendants argue that, when the legislature first enacted § 31-308 (b), "medicine was in the dark ages compared to today, and transplants would have been viewed as science fiction," and that, "without life saving measures such as transplants being available, injuries causing complete loss of the brain, heart, and lungs would have resulted in death and no permanent partial disability benefits would have been owed." The provisions of § 31-308 (b) referencing organs and enumerating covered organs, however, were not enacted during the "dark ages" of medicine but in the 1960s and 1990s. This court takes judicial notice that, contemporaneous with the 1967 and 1993 amendments to § 31-308 (b), the first heart transplant in the United States was performed in 1968, with the first procedure resulting in long-term success in 1981. See P. Linden, "History of Solid Organ Transplantation and Organ Donation," 25 Critical Care Clinics 165, 170 (2009). Subsequently, that procedure has been relatively common throughout the 1990s to present.

[9] As discussed at oral argument before this court, organ transplants, including heart transplants, are distinct from joint replacements because the member's rating includes the relevant joint; thus, there is no reasonable argument that the entire member is lost in that instance, with only a portion of its function lost as a result of the joint replacement. We also recognize that artificial mechanisms exist that would sustain heart functioning in place of a heart composed of living tissue. See J. Cook et al., "The Total Artificial Heart," 7 J. Thoracic Disease 2172, 2172 (2015). The organ at issue in the present case, however, is one that is enumerated under § 31-308 (b) and that was completely replaced by living tissue. We note, therefore, that this case does not disturb the treatment of joint replacements, which replace a part of a member and are distinct from a total replacement of an enumerated organ, such as the heart. See *Rayhall* v. *Akim Co.*, supra, 263 Conn. 357 (recognizing that maximum medical improvement of leg would be found after completion of knee replacement).

———————————————